# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

06 JUL 31 PM 2:46

RICHARD PARKER,
18700 102nd Street
Bristol, WI 53104,
Individually and on behalf of all others similarly
situated,

          Plaintiff,

    v.

BRISTOL-MYERS SQUIBB CO.
345 Park Avenue New York, NY 10154,

SANOFI-AVENTIS
174 Avenue de France
75013 Paris, France,

SANOFI-AVENTIS U.S. L.L.C.
300 Somerset Corporate Blvd.
Bridgewater, NJ 08807-2854,

SANOFI-SYNTHELABO INC.
90 Park Avenue New York, NY 10016,

BRISTOL-MYERS SQUIBB SANOFI
PHARMACEUTICAL HOLDINGS
PARTNERSHIP
P.O. Box 4000, Route 206 and Province Line Rd.
Prinston, N.J. 08543,

APOTEX CORPORATION
2400 North Commerce Parkway Suite 400
Weston, FL 33326,

          Defendants.

BECKWITH

J. BLACK

Case No. 1:06 C V 504

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

    Plaintiff RICHARD PARKER, by and through her undersigned attorneys, brings this

action on behalf of himself and all others similarly situated, against Defendants Sanofi-Aventis,

Sanofi-Synthelabo, Inc., Sanofi-Aventis U.S. L.L.C., Bristol-Myers Squibb Sanofi Pharmaceutical Holding Partnership (collectively "Sanofi," unless otherwise noted), Bristol-Myers Squibb Co. ("BMS"), and Apotex Corporation ("Apotex") (collectively, "Defendants"). Plaintiff makes the following allegations based upon personal knowledge as to those matters relating to himself and upon information and belief as to all other matters.

## NATURE OF THE ACTION

1.     Sanofi and BMS jointly market clopidogrel bisulfate tablets under the brand-name Plavix® ("Plavix"). Plavix is a prescription drug used primarily to treat patients who are at risk for heart attack and stroke. According to the 2006 Edition of the *Red Book*, a source of pharmaceutical data relied upon by pharmacists, Plavix ranked as the 13th most prescribed drug in 2005, with a total of 18,822,723 prescriptions during the period January 2005 to December 2005. Plavix sales for 2005 totaled $3.8 billion for Bristol-Myers, and over $2 billion for Sanofi.

2.     This antitrust class action seeks declaratory relief, injunctive relief and damages resulting from an unlawful agreement whereby Apotex, a major generic pharmaceutical manufacturer, has agreed not to market a generic version of Plavix. Apotex was prepared to launch its generic version of Plavix in January 2006, when the Federal Food and Drug Administration ("FDA") granted final marketing approval. Instead of launching its generic product, however, Apotex entered into an agreement with Sanofi and BMS ("the Sanofi/BMS-Apotex Agreement" or "the Agreement") to withhold its product from the market in exchange for cash payments from Sanofi and BMS.

3.     Defendants also agreed to settle patent infringement litigation that Sanofi had brought against Apotex, alleging that Apotex's generic Plavix drug product infringed one of

Sanofi's patents. The proposed settlement is provisional and subject to approval by the Federal Trade Commission ("FTC") and state attorneys general. Until the FTC and state attorneys general complete their review of the proposed settlement — regardless of whether the settlement is approved — Apotex has agreed to refrain from selling generic Plavix in exchange for monetary payments.

4. The Agreement entered between would-be horizontal competitors is *per se* unlawful (or an unreasonable restraint of trade) under federal and state antitrust laws. The Sanofi/BMS-Apotex Agreement has denied Plaintiff and other Plavix consumers and third-party payors of the benefits of competition from less expensive, generic versions of Plavix. As a result, Plaintiff and members of the Class, defined below, have paid supracompetitive prices for clopidogrel bisulfate tablets.

5. This class action is brought on behalf of all end-payors (*i.e.*, consumers and other persons or entities that pay, in whole or in part, for prescriptions for family members, employees, beneficiaries or insureds) who purchased or paid for Plavix since January 20, 2006.

6. In Count I, Plaintiff seeks a judgment declaring the Sanofi/BMS-Apotex Agreement is *per se* unlawful (or an unreasonable restraint of trade) under Section 1 of the Sherman Act, 15 U.S.C. § 1, and, pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, enjoining the continuation of Defendants' anti-competitive agreements. Plaintiff also seeks to enjoin the continuation of Sanofi's and BMS's unlawful monopolistic practices in violation of § 2 of the Sherman Act, 15 U.S.C. § 2. Unless enjoined, Defendants' unlawful conduct will continue unchecked and Plaintiff and the Class will continue to be damaged by the antitrust

violations. Neither Plaintiff nor the Class seek any relief under Section 4 of the Clayton Act, 15 U.S.C. §15.

      7.      In Count II, Plaintiff and the Class seek damages against all Defendants for entering an agreement in restraint of trade in violation of the antitrust and/or consumer protection statutes of Arizona, Arkansas, California, District of Columbia, Florida, Idaho, Iowa, Kansas, Louisiana, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Utah, Vermont, West Virginia and Wisconsin (collectively, the "Indirect Purchaser States").

      8.      In Count III, Plaintiff and the Class seek restitution, disgorgement and constructive trust for unjust enrichment by Defendants.

## JURISDICTION AND VENUE

      9.      This action is brought under Section 16 of the Clayton Act, 15 U.S.C. § 26, for injunctive relief, and the costs of suit, including reasonable attorneys' fees, for injuries sustained by Plaintiff and members of the Class as a result of Defendants' violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, as alleged herein.

      10.      This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. §§ 22 and 26, 28 U.S.C. §§ 1331, and 1337(a). This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a).

      11.      This Court has jurisdiction pursuant to 28 U.S.C. § 1332(d)(2), which provides federal district courts with original jurisdiction over civil actions in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interests and costs, and is a

class action in which "any member of a class of plaintiffs is a citizen of a state different from any defendant."

12.     Venue is proper in this District under 15 U.S.C. §§ 15, 22, and 26 and under 28 U.S.C. § 1391, because: (1) Defendants transact business and are found within this District; and (2) a substantial portion of the affected trade and commerce described below has been carried out in this District.

## PARTIES

### *Plaintiff*

13.     Plaintiff Richard Parker is a resident of the State of Wisconsin.  Plaintiff paid supra-competitive prices for some or all of the cost of Plavix, purchased for his consumption.

### *Defendants*

14.     Sanofi-Aventis is a French corporation with its U.S. headquarters in Bridgewater, New Jersey.  Sanofi-Aventis is the third largest pharmaceutical manufacturer in the world, and it develops, manufactures, and sells brand-name pharmaceutical products throughout the United States.

15.     Sanofi-Synthelabo, Inc. is a Delaware corporation having a commercial headquarters at 90 Park Avenue, New York, New York, 10016.

16.     Sanofi-Aventis U.S. L.L.C. is a Delaware limited liability company with its principal place of business at 300 Somerset Corporate Boulevard, Bridgewater, N.J. 08807. Sanofi-Aventis U.S. L.L.C. is the holder of the approved New Drug Application ("NDA") for Plavix.

17.     Bristol-Myers Squibb Sanofi Pharmaceutical Holding Partnership (the "Partnership") is a Delaware partnership having a mailing address at P.O. Box 4000, Route 206 and Province Line Road, Princeton, N.J. 08543. The partnership is responsible for the marketing and sale of Plavix in the United States.

18.     Bristol-Myers Squibb Co. ("BMS") is a Delaware corporation having its principal place of business in New York, New York. BMS sells Plavix in this District and throughout the United States as part of a business arrangement with Sanofi.

19.     Apotex Corporation ("Apotex") is a Delaware corporation having its sales and marketing headquarters and principal place of business in Weston, Florida. Apotex is a wholly-owned subsidiary of Apotex, Inc., Canada's largest generic drug manufacturer.

## RELEVANT MARKET

20.     To the extent applicable to the claims alleged herein, the relevant product market is the market for the manufacture and sale of clopidogrel bisulfate tablets, including Plavix and generic bioequivalent products rated "AB" by the United States Food and Drug Administration (the "FDA"). The relevant geographic market is the United States as a whole (for Counts I and III) and the Indirect Purchaser States (for Count II). At all relevant times, including the present, Sanofi's and BMS's market share in the relevant product and geographic markets was and is 100%. By alleging a Relevant Market, Plaintiff and the Class do not waive their claims that Defendants' conduct was a *per se* violation of the federal and/or state antitrust and/or consumer protection laws.

## FACTUAL ALLEGATIONS

### A.     The Regulatory Process Governing Pharmaceuticals in the United States.

21.    The events alleged herein take place in the complex regulatory environment for approval of pharmaceuticals. The Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301, *et seq.*, ("FD&C Act") as amended by the Drug Price Competition and Patent Term Restoration Act of 1984 (the "Hatch-Waxman Act"), and the Medicare Prescription Drug, Improvement and Modernization Act of 2003, codified at 21 U.S.C. § 355(j) and 35 U.S.C. § 271(e) (2005), establishes procedures designed to facilitate competition from lower-priced generic drugs.

22.    Approval by the FDA (the governmental body charged with regulating the pharmaceutical industry) is required before a company may begin selling a new drug in interstate commerce in the United States. 21 U.S.C. § 355(a). Pre-market approval for a new drug must be sought by filing a new drug application ("NDA") with the FDA under § 355(b) of the FD&C Act demonstrating that the drug is safe and effective for its intended use.

23.    New drugs that are approved for sale in the United States by the FDA are often covered by patents, which provide the patent owner with the ability to seek to exclude others from making, using, and/or selling (depending on the scope of the patent) that new drug in the United States for the duration of the patents, plus any extension of the original patent granted pursuant to the Hatch-Waxman Act, 21 U.S.C. § 355.

24.    Pursuant to 21 U.S.C. § 355(b), in its NDA the pioneer drug manufacturer must list those patents that claim the drug for which FDA approval is being sought or that claim a method of using the drug and with respect to which a claim of patent infringement could reasonably be asserted against an unlicensed manufacturer or seller of the drug. Once the NDA is approved by the FDA, any such patents are listed with the NDA in a publication known as the

-7-

Approved Drug Products With Therapeutic Equivalence Evaluations, commonly referred to as the "Orange Book."

25.     Federal regulations impose strict limitations on the types of patents that an NDA holder can submit to the FDA for listing in the Orange Book.  *See generally* 21 C.F.R. § 314.53. One such limitation is imposed by 21 C.F.R. § 314.53(b), which explicitly prohibits NDA holders from listing any patent in the Orange Book unless a claim of infringement could reasonably be asserted on the basis of such a patent.

26.     Despite the FDA regulations that limit the types of patents that NDA holders can list in the Orange Book, it has regrettably become common for brand-name pharmaceutical companies to list in the Orange Book any and every patent they can obtain, so as to force generic manufacturers to file what, as described below, is commonly known as a "Paragraph IV certification."

27.     The FDA does not police the listing of patents.  The FDA does not employ any adjudicatory or other process to determine whether a patent submitted by an NDA holder qualifies for listing in the Orange Book.  The FDA has stated that it lacks the resources and expertise to review the patents submitted in connection with NDAs.

28.     As a result, the FDA's role in the patent listing process is purely ministerial, and it relies entirely upon the good faith of the NDA holder submitting the patent for listing.

**B.**     **Generic Drugs and Abbreviated New Drug Applications ("ANDAs").**

29.     Generic drugs are drugs that the FDA has found to be bioequivalent to corresponding brand-name drugs.  A generic drug provides identical therapeutic benefits and has the same side effects and safety profile as its corresponding brand-name drug.

-8-

30. Generic drugs invariably cost substantially less than the bioequivalent branded drugs. Typically, the first generic version of a brand-name drug is sold at a substantial discount to the brand, followed by increasingly steeper discounts as more generics enter the market.

31. Under the Hatch-Waxman Act, a generic drug manufacturer may seek expedited FDA approval to market a generic version of a brand-name drug with an approved NDA by filing an Abbreviated New Drug Application ("ANDA"), pursuant to 21 U.S.C. § 355(j). An ANDA relies on the safety and efficacy data already filed with the FDA by the manufacturer of the equivalent brand-name drug.

32. After an applicant has submitted its ANDA to the FDA, it must file a patent certification pursuant to 21 U.S.C. § 355(j)(2)(A)(vii). Four types of certifications are available:

> (i) The brand-name manufacturer has not filed patent information with the FDA (a "Paragraph I certification");
>
> (ii) The patent or patents listed in the Orange Book have expired (a "Paragraph II certification");
>
> (iii) The patent will expire on a date in the future, and the generic manufacturer does not seek to market its generic version of the drug prior to the date of expiration (a "Paragraph III certification"); or
>
> (iv) The patent is invalid or not infringed by the generic manufacturer's product (a "Paragraph IV certification").

21 U.S.C. § 355(j)(2)(A)(vii).

33. A generic drug applicant must serve the brand-name drug company with a notice that it has filed a certification under Paragraph IV. The Paragraph IV certification constitutes a "technical act of infringement" under the Hatch-Waxman Act which creates jurisdiction in the federal courts to entertain a patent infringement action, and gives the NDA holder forty-five days

from the date of the notice to institute such an action against the generic manufacturer under 35 U.S.C. § 271(e)(2). *See* 21 U.S.C. § 355(j)(5)(B)(iii). If such a suit is initiated, the FDA's approval of the ANDA is automatically stayed for up to thirty months. 21 U.S.C. § 355(j)(5)(B)(iii).

34.    Because of this thirty-month stay, the mere filing of an infringement action in response to a Paragraph IV certification, regardless of the action's underlying merit, gives the brand-name company the functional equivalent of a self-effectuating preliminary injunction blocking the entry of a generic competitor, without the brand company's ever having to establish likelihood of success on the merits, irreparable harm, that the balance of hardships tips in its favor, or that the public good is served by the blocking of entry.

35.    An improper Orange Book listing has additional anticompetitive effects because the first generic company to file an ANDA with a Paragraph IV certification is, upon FDA approval, granted a 180-day period of marketing exclusivity in relation to other generic manufacturers. 21 U.S.C. § 355(j)(5)(B)(iv). This 180-day exclusivity period is awarded to the first Paragraph IV filer regardless of whether or not the brand company institutes pre-approval patent infringement litigation in response to the Paragraph IV certification. Absent an improper Orange Book listing, no Paragraph IV certification would be required and, thus, no generic company would receive 180-day exclusivity; rather, multiple generic competitors would enter the market simultaneously.

36.    Sanofi and BMS were at all times fully familiar with their ability to delay the entry of generic competition by the improper manipulation of the patent listing and pre-approval litigation provisions of the Hatch-Waxman Amendments.

**C.**      <u>The FDA Approves the New Drug Application (NDA) for Plavix.</u>

37.      Sanofi submitted an NDA for Plavix (clopidogrel bisulfate) tablets, 75 mg, on April 28, 1997. Sanofi sought approval to market Plavix for use in the reduction of atherosclerotic events (myocardial infarction, stroke, vascular death) in patients with atherosclerosis documented by recent stroke, recent myocardial infarction, or established peripheral arterial disease.

38.      Sanofi (or one of its affiliates) caused several patents to be listed in the Orange Book as applying to Plavix, including U.S. Patent No. 4,847,265 (the "'265 patent"); U.S. Patent No. 5,576,328 (the "'328 patent"); U.S. Patent No. 6,429,2 10 (the "'210 patent"); and U.S. Patent No. 6,504,030 (the "'030 patent").

39.      On November 17, 1997, the FDA approved Sanofi's NDA. Pursuant to its business partnership with Sanofi, BMS began selling Plavix throughout the United States.

40.      Because Sanofi was entitled to a period of exclusivity for marketing a new drug, no generic manufacturer could file an ANDA for approval to market and sell generic Plavix for four years.

**D.**      <u>Apotex Files an ANDA to Market A Generic Version of Plavix.</u>

41.      On November 16, 2001, Apotex filed an ANDA seeking FDA approval to market a generic version of Plavix in the United States. Apotex was the first generic applicant to seek such approval. In connection with its ANDA, Apotex submitted a Paragraph IV certification stating that each patent listed in the Orange Book for Plavix was invalid, unenforceable, or would not be infringed by Apotex's proposed generic product. Apotex also notified Sanofi of its Paragraph IV certifications applying to these patents.

E.  **Sanofi Sues Apotex For Infringement of the '265 Patent (Among Others), Giving Rise to Automatic Stay of FDA's Authority to Approve Apotex's ANDA.**

42.  On March 21, 2002, Sanofi (and its affiliates, including its partnership with BMS) filed suit in United States District Court for the Southern District of New York against Apotex, asserting infringement of two of the U.S., patents relating to Plavix under 35 U.S.C. § 271(e)(2)(A), triggering a 30-month delay in FDA approval of Apotex's ANDA.

43.  The first patent in suit, the '265 patent, expires in 2011.  Sanofi asserts that the '265 patent discloses and claims the compound clopidogrel.  The second patent in suit, the '328 patent, expires in 2014.  Sanofi asserts the '328 patent discloses and claims the use of clopidogrel in the treatment of patients to prevent a secondary ischemic event.

44.  In June of 2003, Sanofi withdrew with prejudice the '328 patent from the patent infringement action against Apotex and proceeded only on the '265 patent.  Thus, from the several original patents listed in the Orange Book as relating to Plavix, Sanofi ultimately has asserted only that a single one of these, the '265 patent, is infringed by Apotex's generic version of Plavix.

45.  The '265 patent, however, is invalid, because it is anticipated by prior art under 35 U.S.C. § 102, for obviousness under 35 U.S.C. § 103, and under the doctrine of obviousness-type double patenting, in light of U.S. Patent No. 4,529,596 (the "'596 patent").

46.  Sanofi and BMS were aware that the '265 patent was invalid, *inter alia*, in light of the '596 patent when they brought their patent infringement suit against Apotex.  This knowledge is reportedly memorialized in an internal Sanofi legal memorandum that cautions generally against reference to enantiomers in a broad patent (such as the '596 patent) due to the possibility

-12-

that a subsequent patent on an enantiomer (such as the '265 patent) would be anticipated by such a disclosure. The memorandum notes, "We have an example of such *self-anticipation* with clopidogrel." Thus, Sanofi's legal counsel was and is aware that the '265 patent is invalid as anticipated by the '596 patent.

47. The '265 patent is also unenforceable because it was procured through improper conduct, including inequitable conduct and/or fraud, before the U.S. Patent & Trademark Office ("PTO"). Specifically, the '265 patent is unenforceable because of material misrepresentations and omissions of fact, made with intent to deceive the PTO, during the prosecution of the application that matured into the '265 patent, including at least the following:

(i) The named inventors Alain Badorc and Daniel Frehel misrepresented in their Declaration and Oath that they were the original, first, and sole joint inventors of the subject matter of the claimed invention;

(ii) The named inventors Alain Badorc and Daniel Frehel and Sanofi patent agents Serge Soria and Jacqueline Laforest, and Sanofi supervisory employee, Dr. Jean-Pierre Maffrand, Director of Sanofi's Hemobiology Department, omitted Jean-Pierre Maffrand as a named inventor of the claimed invention;

(iii) The representation by Alain Badorc, Daniel Frehel, Jean-Pierre Maffrand, Serge Soria, and Jacqueline Laforest in the application for the '265 patent of "unexpected" results of pharmacological activity of the d enantiomer, with the l enantiomer being inactive, which representation stemmed from the French priority application 87 02025 (filed February 17, 1987), was false in view of numerous references in the scientific literature before May 1986 that enantiomers have different biological activity;

-13-

(iv)    The representation by Alain Badorc, Daniel Frehel, and Jean-Pierre Maffrand, in the application for the '265 patent of "unexpected" results of pharmacological activity of the d enantiomer, with l enantiomer being inactive, which representation stemmed from the French priority application 87 02025 (filed February 17, 1987), was false in view of the fact that Sanofi and Dr. Jean-Pierre Maffrand were aware since the 1978-1980 time period that Sanofi had separated a racemic analog of the thienopyridine compound claimed in the application for the '265 patent, and tested the enantiomers of the analog, and found that one enantiomer was pharmacologically active and the other was not;

(v)    Alain Badorc, Daniel Frehel, and Dr. Jean-Pierre Maffrand failed to disclose to the patent examiner that in 1978 Sanofi had separated a racemic analog of the thienopyridine compound claimed in the application for the '265 patent, and tested the enantiomers of the analog, and found that one enantiomer was pharmacologically active and the other was not;

(vi)    The representation of Alain Badorc, Daniel Frehel, and Jean-Pierre Maffrand in the application for the '265 patent that it was "unexpected" that the pharmacologically inactive enantiomer was less well tolerated than the d enantiomer, which representation stemmed from the French priority application 87 02050 (filed February 17, 1987), was false because Alain Badorc, Daniel Frehel, and Jean-Pierre Maffrand were aware that Sanofi had separated a racemic analog of the thienopyridine compound claimed in the application for the '265 patent, and tested the enantiomers of the analog, and found that the enantiomer that was pharmacologically active was also better tolerated;

-14-

(vii)    The named inventors Alain Badorc and Daniel Frehel and supervisory employee Dr. Jean-Pierre Maffrand failed to disclose that in about 1978-1980, Sanofi had separated a racemic analog of the thienopyridine compound claimed in the application for the '265 patent, and tested the enantiomers of the analog for toxicity and tolerance, and found that the enantiomer that was pharmacologically active was also better tolerated;

(viii)    The representation of Alain Badorc, Daniel Frehel, Jean-Pierre Maffrand, Serve Soria and Jacqueline Laforest in the application for the '265 patent that the pharmacologically inactive l enantiomer was less well tolerated than the d enantiomer, which representation stemmed from the French priority application 87 02050 (filed February 17, 1987), was false because it was unsupported by any objective data to substantiate the representation; and

(ix)    Prior to the filing date of the application for the '265 patent in the United States, Jean-Pierre Mafrand was aware of a journal article by Robert W. Colman and William R. Figures, "Characteristics of an ADP receptor mediating platelet activation," Molecular and Cellular Biochemistry 59:101-111 (1984), which was material prior art and would have been important to a reasonable examiner in deciding whether to allow the claims of the application to issue, in that it described the stereospecificity of the ADP (adenosine diphosphate) protein receptor that mediates platelet aggregation activity, and various ADP antagonists, and other important structure-activity aspects of ligand-receptor interaction, and Dr. Maffrand failed to disclose the Colman and Figures article to the patent examiner.

48.    The foregoing false statements, omissions, and misrepresentations, among others, made by the applicants Alain Badorc and Daniel Frehel, by Dr. Jean-Pierre Maffrand, and by Serge Soria and Jacqueline LaForest were material to patentability, and were made willfully and

-15-

in bad faith with intent to mislead the PTO and, in fact, did mislead the PTO, resulting in the issuance of the '265 patent.

49.     Apotex defended the patent litigation brought by Sanofi on the grounds set forth above, and others.  Apotex asserted that the '265 patent was invalid for lack of novelty, obviousness, and incorrect naming of inventors, and that it was unenforceable due to inequitable conduct during the prosecution of the patent, including for the reasons identified above.  Prior to the Agreement, the patent litigation was set for trial.

**F.     Defendants Enter A Horizontal Market Allocation Agreement To Preserve The Plavix Monopoly And Share the Monopoly Rents.**

50.     By late 2005, Apotex was aware that final FDA approval was imminent and planned and made preparations to begin marketing generic Plavix following FDA final approval.

51.     Apotex contacted potential purchasers of generic Plavix in an effort to obtain pre-launch commitments from purchasers in anticipation of final FDA approval and a prompt generic launch.

52.     On January 14, 2006, Apotex stated in a court filing that final FDA approval was imminent and that Apotex intended and was prepared to bring its generic version of clopidogrel bisulfate to market.

53.     On January 20, 2006, following expiration of the 30-month stay, Apotex received final FDA approval to market its generic version of Plavix.  The FDA also notified Apotex that, since Apotex was the first to file a substantially complete ANDA with a Paragraph IV certification for clopidogrel bisulfate tablets, 75 mg, it was eligible for 180-days of market exclusivity.  This exclusivity, provided for under section 505(j)(5)(B)(iv) of the FD&C Act,

would begin to run from the earlier of the commercial marketing by Apotex of the drug or certain court decision dates identified in the Act.

54.    Apotex immediately issued a press release, in which Dr. Barry Sherman, Apotex's Chief Executive Officer announced: "Apotex is confident that the ['265] patent will be held invalid and that an affordable generic equivalent to Plavix will be available to consumers. We have been fighting for this for years and are committed to ensuring that the product comes to market as soon as the time is right."

55.    Sanofi and BMS were aware of Apotex's intention to bring its generic Plavix product to market and were concerned about this development, because of the large contribution that Plavix made to the profits of Sanofi and BMS.

56.    Sanofi did not, however, seek a preliminary injunction in the district court overseeing the patent litigation. Sanofi knew that it did not have a likelihood of success on the merits of its infringement claim, because it knew that, for the reasons heretofore stated, the '265 patent was invalid and unenforceable.

57.    Aside from Sanofi's internal conclusion that the '265 patent was anticipated and invalid, Sanofi was aware of the conclusion of independent analysts that the '265 patent was faced with a strong invalidity challenge. In 2004, for example, Aventis, which was subject to a hostile bid from Sanofi, hired Jeffrey Lewis, a patent attorney from Patterson, Belknap, Webb & Tyler LLP, to review the publicly available information from the patent litigation and give an opinion to Aventis shareholders on the risks of the Plavix litigation to Sanofi. In March of 2004, Mr. Lewis, who noted that he worked exclusively for companies selling the brand-name drug in similar lawsuits, announced his conclusions in a presentation to analysts and shareholders. Mr.

-17-

Lewis discussed the invalidity arguments based on the '596 patent and stated, *inter alia*: "From everything I have seen I agree that ... there is a very valid challenge to the '265 patent ...."

58.     Instead of seeking a preliminary injunction to prevent Apotex from entering the market with its FDA-approved generic version of Plavix, Sanofi began negotiations with Apotex about a proposed agreement pursuant to which Apotex would voluntarily refrain from coming to market with its generic Plavix in exchange for substantial payments from Sanofi and BMS.

59.     As these negotiations progressed, Apotex informed those it had contacted to buy generic Plavix that it would no longer be coming to market.

60.     On March 21, 2006, Defendants announced that they had entered into the Sanofi/BMS-Apotex Agreement, whereby Sanofi and BMS would make payments to Apotex and, in return, Apotex would agree not to enter the market with its FDA-approved generic version of Plavix until September 17, 2011, just two months before the scheduled expiration of the '265 patent. The Sanofi/BMS-Apotex Agreement further provides that Sanofi will grant Apotex a license to sell its generic product that will become effective on September 17, 2011, unless certain conditions are met. The parties also agreed to settle and dismiss the patent litigation.

61.     Defendants issued press releases announcing the Sanofi/BMS-Apotex Agreement to settle the patent litigation and noted that there was a "significant risk" that the settlement would not be finalized because it would not be approved by the FTC. However, pursuant to the Sanofi/BMS-Apotex Agreement challenged herein, Apotex will receive payments from Sanofi and BMS for not coming to market with its generic Plavix, even if the settlement of the patent litigation is not approved.

62.     On June 25, 2006, it was announced in an "Update" that BMS, Sanofi and Apotex modified their Agreement after it was reportedly rejected by the FTC and state attorneys general. Under the revised Sanofi/BMS-Apotex Agreement, Apotex's generic version of Plavix will be kept off the market until June 1, 2011, rather than September 17, 2011. At that time, Apotex will pay a royalty to distribute its generic version of the drug. The "Update" emphasized that: "There is no assurance that the revised agreement will address all of the concerns of the FTC and state attorneys general and there remains a significant risk that antitrust clearance will not be obtained."

63.     On July 26, 2006, federal agents raided BMS's Manhattan headquarters, searched the office of BMS's Chief Executive Officer (Peter Dolan), among others, and removed documents from the building. On July 27, 2006, BMS announced that it was the subject of criminal investigation by the U.S. Department of Justice concerning the Sanofi/BMS-Apotex Agreement. On July 28, 2006, a coalition of 56 state and territorial attorneys general informed BMS that it would oppose the Agreement.

64.     To date, Apotex has abided by the Sanofi/BMS-Apotex Agreement not to sell generic Plavix in the United States. Notwithstanding the rejection by state and territorial attorneys general, Apotex will still be paid at least $40 million by BMS. Apotex has also not relinquished its 180-days of market exclusivity. No other company has received FDA approval to market a generic version of Plavix.

65.     The Sanofi/BMS-Apotex Agreement is a horizontal agreement not to compete and a violation of Sections 1 and 2 of the Sherman Act and parallel state antitrust statutes.

**G.     BMS's "Track Record" Of Anticompetitive Conduct.**

66.     BMS is no stranger to the kind of anticompetitive scheme alleged herein, having

resolved litigation in the past few years concerning similar behavior designed to foreclose or

delay generic competition to several of its brand-name drugs.  For example, BMS was sued by

the attorneys general of over 35 states, the FTC, and nationwide classes of direct and indirect

purchasers of the drug Buspar®.  BMS agreed to pay $535 million to settle those charges.

67.     Regarding its scheme to block generic competition for the cancer drug Taxol®,

BMS was similarly sued by the attorneys general of all 50 states, the FTC, and nationwide

classes of direct purchasers and third-party payors.  BMS agreed to pay over $135 million to

settle those charges, and also agreed to the entry of injunctive relief barring it from engaging in

similar misconduct for ten years.  Among other things, BMS was enjoined from:

    (a)     improperly listing any patent in the Orange Book in the future;

    (b)     making any statements to the FDA that are (1) false and misleading; and

(2) material to the approvability of a competing generic application;

    (c)     asserting any fraudulent or objectively baseless claim, or otherwise

engaging in sham litigation for the purpose of injuring a competing generic application;

    (d)     enforcing or seek to enforce any patent that it knows is invalid,

unenforceable, or not infringed; and

    (e)     acquiring from another person a patent or an exclusive license to a patent

if BMS seeks or secures the patent's listing in the Orange Book in reference to an already

approved drug without providing prior written notification to the States.

68.     BMS was also enjoined from resolving or settling a patent infringement claim in

which an ANDA filer receives anything of value unless BMS obtains an advisory opinion from

-20-

the FTC that Sanofi/BMS-Apotex Agreement would not raise issues under Section 5 of the Federal Trade Commission Act.

### G.     The Market Effect of Defendants' Anticompetitive Conduct.

69.     Almost all states (and the District of Columbia) encourage generic competition through laws that allow or require pharmacists to substitute brand-name drugs with their "AB-rated" generic equivalents, unless a physician directs or the patient requests otherwise.  Many third-party payors of prescription drugs (*e.g.*, health insurance plans, Medicaid programs) have adopted policies to encourage the substitution of available AB-rated generic drugs for their branded counterparts, such as requiring higher copayments for branded products.  Moreover, retailers enjoy higher profit margins on generic pharmaceuticals than they do on branded pharmaceuticals, giving them a financial incentive to encourage customers to purchase less-expensive generic products.

70.     Given the legal, regulatory and economic forces described above, it is well recognized that the introduction of a generic pharmaceutical product causes an immediate and steep decline in the brand's market share and profits, which increases over time.  For example, a 1998 study by the Congressional Budget Office showed that for twenty-one innovator drugs where generics entered the market from 1991-1993, in the first full calendar year of entry, generics accounted for an average of forty-four percent of prescriptions dispensed through pharmacies.  [C.B.O. Study at 28].  In the longer term, fourteen months after entry, the average generic market share was seventy-one percent. [Henry Grabowski and John Vernon, "Longer Patents for Increased Generic Competition: The Waxman-Hatch Act After One Decade", PharacoEconomics, 12 (1996)].

71.     In addition, the prices for generic products are significantly reduced over time and that reduction is directly related to the number of generic manufacturers entering the market. The reduction in price is significant when just one generic manufacturer enters the market. Typically the first generic company places the product on the market at 60% to 70% of the brand price. Such prices still afford the generic manufacturer gross margins of 70% or better. When a second generic enters the market, prices of the generic product are likely to fall to between 50% to 60% of the brand price. Each subsequent competitor can lower the price further until five or more generics have entered the market, when the generic drug price can stabilize at 20% to 30% of the brand price.

72.     Accordingly, Defendants were well aware that any delay in generic entry leads directly to inflated brand profits and damages to Plaintiff and the Class. With no available generic alternative with which to fill prescriptions for clopidogrel bisulfate tablets or Plavix, consumers and third-party payors have no choice but to pay supracompetitive prices for branded Plavix, the proceeds of which are now shared with Apotex for withholding lawful competition. But for the Sanofi/BMS-Apotex Agreement, Apotex would have begun marketing its generic Plavix after it received FDA approval of its ANDA on or about January 20, 2006.

73.     If a generic version of Plavix had been introduced to the market, Plaintiff and members of the Class would have substituted the lower-priced generic Plavix for all or a portion of their purchases of branded Plavix, or would have paid substantially less for branded Plavix because Sanofi and BMS would have lowered net Plavix prices in response to competition, or would have reduced the rate of price increases for Plavix in response to such generic competition.

74.     As a consequence of the unlawful conduct alleged herein, Plaintiff and members

of the Class have been deprived of the benefits of free and open competition in their purchases.

Patients prescribed  clopidogrel bisulfate tablets or Plavix must continue purchasing brand-name

Plavix when, but for the Sanofi/BMS-Apotex Agreement, a less expensive generic product would

have otherwise been available.

## CLASS ACTION ALLEGATIONS

75.     Plaintiff brings this action pursuant to Rule 23(b)(2) and (b)(3) of the Federal

Rules of Civil Procedure, on behalf of themselves and the following class:

> All persons and entities throughout the United States and its territories who
> purchased clopidogrel bisulfate tablets, including Plavix, for consumption by
> themselves, their families, or their members, employees, insureds, participants, or
> beneficiaries (the "Class") during the period from January 20, 2006, through the
> date on which the anticompetitive effects of Defendants' conduct cease ("the
> Class Period").  For the purpose of the Class definition, persons and entities
> "purchased" clopidogrel bisulfate tablets if they paid or reimbursed for some or all
> of the purchase price.  Excluded from the Class are all Defendants, their officers,
> subsidiaries, and affiliates; all government entities (except for government-funded
> employee benefit plans); and all persons or entities that purchased clopidogrel
> bisulfate tablets for purposes of resale, or directly from any of the Defendants or
> their affiliates.

76.     The Class is so numerous that joinder of all members is impracticable.  Class

members include consumers and third party payors. Upon information and belief, the Class

includes a minimum of thousands of members.

77.     There are questions of law and fact common to the Class, including but not

limited to, the following:

(a)     whether Defendants combined, agreed, or conspired as alleged herein in

restraint of trade;

-23-

(b)     whether Defendants' agreement, combination, or conspiracy was lawful;

(c)     whether Defendants' unlawful conduct as alleged herein has affected interstate commerce;

(d)     whether Defendants' unlawful conduct caused Plaintiff and the other members of the Class to pay more for Plavix and its generic equivalents than they would have paid absent Defendants' conduct; and

(e)     whether Defendants' unlawful conduct caused antitrust injury to the business or property of Plaintiff and the members of the Class and, if so, the appropriate relief and/or measure of damages.

78.     These and other questions of law and fact are common to the members of the Class and predominate over any questions affecting individual members.

79.     Plaintiff's claims are typical of the claims of the Class because Plaintiff and all Class members suffered antitrust injury by the same wrongful conduct by the Defendants. All Class members have paid artificially inflated prices for Plavix and its generic equivalents resulting from Sanofi/BMS-Apotex Agreement to exclude generic competition.

80.     Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel experienced in class action and antitrust litigation. Plaintiff has no interest in this litigation that is adverse to, or in conflict with, the interests of the other members of the Class.

81.     A class action is superior to any other available methods for the fair and efficient adjudication of this controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and

without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would require. The benefits of proceeding by way of class action, including providing injured persons or entities with a method for obtaining redress on claims that they might not be able to pursue individually, substantially outweigh any difficulties that may arise in the management of a class action.

82.     Defendants have acted and refused to act, as alleged herein, on grounds generally applicable to the Class as a whole.

83.     Plaintiff knows of no difficulty that would be encountered in the management of the claims advanced by the Class that would preclude certification.

## INTERSTATE TRADE AND COMMERCE

84.     During the period relevant to this litigation, Plavix was sold throughout the United States. Plavix was manufactured and sold in a continuous and uninterrupted flow of commerce across state lines. Defendants' unlawful activities alleged in this Complaint have occurred in and have had a substantial effect upon interstate commerce.

85.     In furtherance of their unlawful conduct, Defendants employed the United States mail and interstate and international telephone lines, as well as means of interstate and international travel.

## COUNT I

### (FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR DEFENDANTS' VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT)

86.     Plaintiff repeats and realleges the preceding and subsequent paragraphs as though set forth herein.

87. Section 1 of the Sherman Act, 15 U.S.C. § 1, provides that:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal.

88. Section 2 of the Sherman Act, 15 U.S.C. § 2, provides in pertinent part that:

> Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons to monopolize any part of trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony[.]

89. Defendants knowingly and willfully entered into a contract, combination, and conspiracy in restraint of trade, and engaged in a course of conduct designated to unlawfully maintain and prolong their monopoly position in the market for clopidogrel bisulfate products in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

90. Defendants have undertaken the foregoing unlawful courses of conduct for the following purposes and with the following effects:

(a) prices for Plavix and its generic equivalents have been fixed, raised, maintained, or stabilized at artificially high and non-competitive levels;

(b) buyers of Plavix have been unable to purchase lower-priced generic versions of Plavix;

(c) buyers of Plavix and its generic equivalents have been deprived of the benefits of free and open competition in their purchases; and

(d) competition in the production and sale of Plavix and its generic equivalents has been restrained, suppressed, and eliminated.

91.     Plaintiff and the other members of the Class have been injured in their business or property by reason of Defendants' antitrust violations alleged in this Count. During the Class period, Plaintiff and members of the Class purchased substantial amounts of Plavix. As a result of Defendants' illegal conduct, Plaintiff and the Class were compelled to pay, and did pay, artificially inflated prices for Plavix. Those prices were and are substantially greater than the prices they would have paid absent the illegal agreement, combination, conspiracy, and other unlawful conduct alleged herein, because they were deprived of the opportunity to: (1) pay lower prices for the generic versions of the drug; (2) pay lower prices for their Plavix requirements by switching more of the volume of their purchases from the brand to the generic versions; and (3) pay lower prices for the brand-name drug Plavix. Members of the Class have sustained substantial losses and damage to their businesses and property in the form of overcharges.

92.     The injury to Plaintiff and the Class is the type of injury antitrust laws were designed to prevent, and the injury flows from Defendants' unlawful conduct. Plaintiff and members of the Class are threatened with further injuries as a result of Defendants' continuing scheme, as alleged herein.

93.     Plaintiff and the Class, therefore, pursuant to Rule 57 of the Federal Rules of Civil Procedure and 18 U.S.C. § 2201(a), seek a declaration that the Sanofi/BMS-Apotex Agreement is a *per se* unlawful (or an unreasonable restraint of trade) under Section 1 of the Sherman Act.

94.     Section 16 of the Clayton Act, authorizing suits for injunctive relief, provides in part:

> Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, ... when and under the

> same conditions and principles as injunctive relief against
> threatened conduct that will cause loss or damage is granted by
> courts of equity.

15 U.S.C. § 26. Plaintiff and the Class seek the issuance of an injunction prohibiting

Defendants' anticompetitive conduct, including their continued compliance with the unlawful

terms of the Sanofi/Apotex-BMS Agreement.

95.     Plaintiff and the Class have no adequate remedy at law.

## COUNT II

### (AGREEMENT IN RESTRAINT OF TRADE IN VIOLATION OF THE ANTITRUST AND/OR CONSUMER PROTECTION STATUTES OF THE INDIRECT PURCHASER STATES)

96.     Plaintiff repeats and realleges the preceding and subsequent paragraphs as though

set forth herein.

97.     The Sanofi/BMS-Apotex Agreement, described herein, constitutes an unlawful

contract, combination, and conspiracy in restraint of trade, and constitutes unlawful acts of

monopolization, conspiracy to monopolize and attempts to monopolize, as well as prohibited

deceptive acts and practices and unconscionable conduct under the antitrust and/or unfair and

deceptive trade practices acts of the Indirect Purchaser States, as follows:

(a)     **Arizona**:  The aforementioned practices by Defendants were and are in

violation of the Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. §§ 44-1401, *et seq.*, the

Arizona Consumer Fraud Act, Ariz. Rev. Stat §§ 44-1521, *et seq.*, and the Constitution of the

State of Arizona, Article 14, §15;

(b)      **Arkansas:** The aforementioned practices by Defendants were and are in violation of the Arkansas Deceptive Trade Practices Act, Ark. Code § 4-88-101, *et seq.*;

(c)      **California**: The aforementioned practices by Defendants were and are in violation of the Cartwright Act, Cal. Bus. & Prof. Code §§ 16700, *et seq.*, and the California Unfair Competition Act, Cal. Bus. & Prof. Code §§ 17200, *et seq.*;

(d)      **District of Columbia**: The aforementioned practices by Defendants were and are in violation of the District of Columbia Antitrust Act, D.C. Code §§ 28-4501, *et seq.*, and the violation of the District of Columbia Consumer Protection Act, D.C. Code § 28-3901, *et seq.*;

(e)      **Florida**: The aforementioned practices by Defendants were and are in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. §§ 501.201, *et seq.*;

(f)      **Idaho:** The aforementioned practices by Defendants were and are in violation of the Idaho Consumer Protection Act, Idaho Code § 48-601, *et seq.*;

(g)      **Iowa**: The aforementioned practices by Defendants were and are in violation of the Iowa Competition Law, Iowa Code §§ 553.4, 553.5 (1997);

(h)      **Kansas**: The aforementioned practices by Defendants were and are in violation of the Kansas Monopolies and Unfair Trade Act, Kan. Stat. Ann. §§ 50-101, *et seq.*, and the Kansas Consumer Protection Act, Kan. Stat. Ann §§ 50-623, *et seq.*;

(i)      **Louisiana**: The aforementioned practices by Defendants were and are in violation of the Louisiana Monopolies Law, La. Rev. Stat. Ann. §§ 51:121, *et seq.*, and the Louisiana Unfair Trade Practices and Consumer Protection Law, La. Rev. Stat. Ann. §§ 51:1401, *et seq.*;

-29-

(j)     **Maine**:  The aforementioned practices by Defendants were and are in violation of the Maine Monopolies and Profiteering Statute, Me. Rev. Stat. Ann. tit. 10, §§ 1101, *et seq.*, and the Maine Unfair Trade Practices Act, Me. Rev. Stat. Ann. tit. 5, §§ 205-A, *et seq.*;

(k)     **Massachusetts**:  The aforementioned practices by Defendants were and are in violation of the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A;

(l)     **Michigan**:  The aforementioned practices by Defendants were and are in violation of the Michigan Antitrust Reform Act, Mich. Comp. Laws §§445.771, *et seq.*, and the Michigan Consumer Protection Act, §§ 445.901, *et seq.*;

(m)     **Minnesota**:  The aforementioned practices by Defendants were and are in violation of the Minnesota Antitrust Law of 1971, Minn. Stat. §§ 325D.49, *et seq.*, and the Minnesota Consumer Fraud Act, Minn. Stat §§ 325F.67, *et seq.*;

(n)     **Mississippi**:  The aforementioned practices by Defendants were and are in violation of Miss. Code Ann. §§ 75-21-1, *et seq.*;

(o)     **Montana:** The aforementioned practices by Defendants were and are in violation of Montana's consumer protection statute, Mont. Code § 30-14-101, *et seq.*;

(p)     **Nebraska**:  The aforementioned practices by Defendants were and are in violation of the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1601, *et seq.*;

(q)     **Nevada**:  The aforementioned practices by Defendants were and are in violation of the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. §§ 598A.010, *et seq.*, and the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. §§ 598.0903, *et seq.*;

(r)    **New Hampshire:**  The aforementioned practices by Defendants were and are in violation of New Hampshire's consumer protection statute, N.H. Rev. Stat. § 358-A:1, *et seq.*;

(s)    **New Mexico:**  The aforementioned practices by Defendants were and are in violation of the New Mexico Antitrust Act, N.M. Stat. Ann. §§ 57-1-1, *et seq.*, and the New Mexico Unfair Practices Act, N.M. Stat. Ann. §§ 57-12-1, *et seq.*;

(t)    **New York:**  The aforementioned practices by Defendants were and are in violation of the Donnelly Act, N.Y. Gen. Bus. Law §§ 340, *et seq.*, and the New York Deceptive Acts and Practices Act, N.Y. Gen. Bus. Law §§ 349, *et seq.*;

(u)    **North Carolina:**  The aforementioned practices by Defendants were and are in violation of North Carolina's antitrust and unfair competition law, N.C. Gen. Stat. §§ 75-1, *et seq.*;

(v)    **North Dakota:**  The aforementioned practices by Defendants were and are in violation of the North Dakota Antitrust Act, N.D. Cent. Code §§ 51-08.1-01, *et seq.*, and the North Dakota Consumer Fraud Act, N.D. Cent. Code §§ 51-15-01, *et seq.*;

(w)    **South Dakota:**  The aforementioned practices of Defendants were and are in violation of South Dakota's antitrust law, S.D. Codified Laws §§ 37-1-3, *et seq.*, and deceptive trade practices and consumer protection law, S.D. Codified Laws §§ 37-24-1, *et seq.*;

(x)    **Tennessee:**  The aforementioned practices of Defendants were and are in violation the Tennessee Trade Practices Act, Tenn. Code Ann. §§ 47-25-101, *et seq.*, and the Consumer Protection Act, Tenn. Code Ann. §§ 47-18-101, *et seq.*;

(y)  **Utah:**  The aforementioned practices by Defendants were and are in violation of the Utah Antitrust Act, Utah Code Ann. §§ 76-10-911, *et seq.* and the Utah Consumer Sales Practices Act, Utah Code Arm. § 13-11-1, *et seq.*;

(z)  **Vermont**:  The aforementioned practices of Defendants were and are in violation of the Vermont Consumer Fraud Act, Vt. Stat. Ann. tit. 9, §§ 2451, *et seq.*;

(aa)  **West Virginia**:  The aforementioned practices by Defendants were and are in violation of the West Virginia Antitrust Act, W.Va. Code §§ 47-18-1, *et seq.*, and the West Virginia Consumer Credit and Protection Act, W. Va. Code §§ 46A-6-101, *et seq.*; and

(bb)  **Wisconsin**:  The aforementioned practices by Defendants were and are in violation of the Wisconsin Antitrust Act, Wis. Stat. §§ 133.01, *et seq.*, and the Wisconsin Unfair Trade Practices Act, Wis. Stat. §§ 100.20, *et seq.*

98.  As a result of the conduct described above, Plaintiff and the Class have sustained and will continue to sustain substantial losses and damage to their businesses and property in the form of, *inter alia*, being deprived of the ability to purchase less expensive, generic versions of Plavix, and paying prices for clopidogrel bisulfate products that were higher than they would have been but for Defendants' improper and unlawful actions.  The full amount of such damages are presently unknown and will be determined after discovery and upon proof at trial.

99.  Plaintiff and the Class seek damages, multiple damages, treble damages, and other damages as permitted by state law, for their injuries caused by these violations pursuant to these statutes.

## COUNT III

## (FOR RESTITUTION, DISGORGEMENT AND
## CONSTRUCTIVE TRUST FOR UNJUST ENRICHMENT)

100.     Plaintiff repeats and realleges the preceding and subsequent paragraphs as though set forth herein.

101.     As a result of their unlawful conduct described above, Defendants have been and will continue to be unjustly enriched. Defendants' unlawful acts impose barriers to entry for generic manufacturers seeking to compete in the relevant market. Defendants have been unjustly enriched, to the detriment of Plaintiff and the Class by the receipt of, at a minimum, unlawfully inflated prices and illegal profits on their sale of Plavix products. Defendants have benefited from their unlawful acts and it would be inequitable for Defendants to be permitted to retain any of their ill-gotten gains resulting from the overpayments for Plavix products made by Plaintiff and the Class.

102.     Plaintiff and members of the Class are entitled to the amount of Defendants' ill-gotten gains resulting from Defendants' unlawful, unjust and inequitable conduct. Plaintiff and the Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiff and the Class members may make claims on a *pro rata* basis.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that:

(a)     the Court determine that this action may be maintained as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure with respect to Plaintiff's claims for declaratory, equitable and injunctive relief, and Rule 23(b)(3) of the Federal Rules of

Civil Procedure with respect to the claims for damages; and declare Plaintiff as representative of the Class;

        (b)    the Sanofi/BMS-Apotex Agreement alleged herein be declared, adjudged and decreed to be a *per se* unlawful (or an unreasonable restraint of trade) under Sections 1 and 2 of the Sherman Act, and under the statutes of the Indirect Purchaser States set forth above;

        (c)    Plaintiff and each member of the Class be awarded damages and, where applicable, treble, multiple, and other damages, including interest;

        (d)    Plaintiff and each member of the Class recover the amounts by which Defendants have been unjustly enriched;

        (e)    Defendants be enjoined from continuing the illegal activities alleged herein;

        (f)    Plaintiff and the Class recover their costs of suit, including reasonable attorneys' fees and expenses as provided by law; and

        (g)    Plaintiff and the Class be granted such other and further as the Court deems just and necessary.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all issues so triable.

Dated: July 31, 2006

STRAUSS & TROY, L.P.A.

By: _____

Richard S. Wayne (0022390)
Thomas P. Glass
The Federal Reserve Building
150 East Fourth Street
Cincinnati, Ohio 45202
Tel: (513) 621-2120
Fax: (513) 241-8259

*Liaison Counsel for Consolidated*
*Indirect Purchaser Actions*

Marvin A. Miller
Patrick E. Cafferty
Lori A. Fanning
MILLER FAUCHER and CAFFERTY LLP
30 N. LaSalle St. Suite 3200
Chicago, IL 60602
Tel: 312-782-4880
Fax: 312-782-4485

Guri Ademi
Shpetim Ademi
Robert K. O'Reilly
ADEMI & O'REILLY, LLP
3620 East Layton Avenue
Cudahy, Wisconsin 53110
Tel: 414/482-8000
Fax: 414/482-8001

*Attorneys for Plaintiff*